J-S13026-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| STEVEN DEVON GREENFIELD | : | |
| | : | |
| Appellant | : | No. 1350 MDA 2019 |

Appeal from the Judgment of Sentence Entered October 11, 2018
In the Court of Common Pleas of Cumberland County Criminal Division at
No(s):  CP-21-CR-0003097-2017

BEFORE:   STABILE, J., DUBOW, J., and PELLEGRINI, J.[*]

MEMORANDUM BY DUBOW, J.:                 **FILED MARCH 27, 2020**

Appellant, Steven Devon Greenfield, appeals from the Judgment of

Sentence of eight and one-half to seventeen years of incarceration, entered

October 11, 2018, following a jury trial resulting in his conviction for Criminal

Attempt (Statutory Sexual Assault), Involuntary Deviate Sexual Intercourse

(IDSI) with a child, Incest, and related crimes.[1]  We affirm on the basis of the

trial court's Opinion filed November 19, 2019.

In its Opinion, the trial court set forth the underlying facts.  ***See*** Trial

Ct. Op., filed 11/19/19, at 1-9.  Briefly, over the course of several years

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 901(a) (3122.1(b)), 3123(b), 4302(b)(2), respectively.  In addition, the jury convicted Appellant of the following crimes: Involuntary Deviate Sexual Intercourse, 18 Pa.C.S. § 3123(a)(7); Indecent Assault of a Child, 18 Pa.C.S. § 3126(a)(7); Indecent Assault, 18 Pa.C.S. § 3126(a)(8); Endangering Welfare of Children, 18 Pa.C.S. § 4304(a)(1); Corruption of Minors, 18 Pa.C.S. § 6301(a)(1)(ii).

beginning when the Victim was twelve years old, Appellant, the Victim's father, sexually abused her. Following trial, the jury convicted Appellant of the crimes set forth above, and the trial court imposed sentence.

In October 2018, Appellant timely filed a Post-Sentence Motion, challenging the weight of the evidence and a decision of the trial court to exclude certain statements made by the Victim during the investigation. Post-Sentence Motion, 10/12/18. The trial court denied Appellant's Post-Sentence Motion.

Appellant did not timely appeal. However, following the appointment of new counsel and collateral proceedings, the court reinstated Appellant's direct appeal rights *nunc pro tunc*. Order, 7/15/19. Thereafter, Appellant timely appealed and filed a court-ordered Pa.R.A.P. 1925(b) Statement; the trial court issued a responsive Opinion.

Appellant raises the following issues on appeal:

1. Whether the [t]rial [c]ourt erred in denying [Appellant] relief in the form [of] setting aside the guilty verdicts of Criminal Attempt – Statutory Sexual Assault, Invol[untary] Deviate Sexual Intercourse [with] Child, Endangering Welfare of Children, Indecent Assault Person Less than 13 Years of Age, and Corruption [o]f Minors, as the verdict was against the weight of the evidence where the testimony of witnesses contradicted each other and as such was incredible[; and]

2. Whether the [t]rial [c]ourt erred in denying [Appellant]s request to introduce statements of the [V]ictim made during the investigation, which statements would have been refuted at trial by defense witnesses if given the opportunity.

Appellant's Br. at 6.

In his first issue, Appellant challenges the weight of the evidence, highlighting minor inconsistencies between the Victim's testimony and the testimony of Appellant's girlfriend, an eyewitness to Appellant's crimes. *See id.* at 12-16.

In addressing an appellant's weight claim, we apply the following principles:

> As a general rule, the weight of the evidence is exclusively for the fact finder who is free to believe all, part or none of the evidence and to determine the credibility of the witnesses. We cannot substitute our judgment for that of the finder of fact. We may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice. Moreover, where the trial court has ruled on the weight claim below, our role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion.

*Commonwealth v. Castelhun*, 889 A.2d 1228, 1234 (Pa. Super. 2005) (internal quotation marks and citations omitted).

Following our review of the record, the briefs of the parties, the applicable law, and the trial court Opinion, we discern no abuse of the trial court's discretion in denying Appellant's challenge to the weight of the evidence. The Honorable Christylee L. Peck has authored a comprehensive and well-reasoned Opinion, citing the record and relevant case law. *See* Trial Ct. Op. at 1-9 (summarizing testimony from the Victim and Appellant's girlfriend), 11-15 (acknowledging minor inconsistencies in the testimony but concluding that the jury was free to credit this testimony and resolve the

conflicts, and opining that the verdict did not shock the conscience of the court). Thus, no relief is due. *See Castelhun*, 889 A.2d at 1234.

In his second issue, Appellant challenges a decision of the trial court to exclude certain evidence. *See* Appellant's Br. at 17-20. Specifically, Appellant wanted to cross-examine the Victim with prior statements that she made about her brother sexually abusing her and step-mother physically abusing her. *See id.*

The admissibility of evidence is within the sole discretion of the trial court. We will reverse an evidentiary ruling only for a clear abuse of the court's discretion. *Commonwealth v. Allison*, 703 A.2d 16, 18 (Pa. 1997). "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused." *Commonwealth v. Holder*, 815 A.2d 1115, 1118 (Pa. Super. 2003) (citation omitted).

Relevant evidence is generally admissible. Pa.R.E. 402. When called upon to determine the relevance of proffered evidence, the trial court must consider whether the evidence bears upon a material fact at issue in the case, and whether it tends to prove or disprove that fact. *See Commonwealth v. Johnson*, 638 A.2d 940, 942 (Pa. 1994).

Evidence challenging the credibility of an adverse witness is relevant. *See, e.g.*, *Commonwealth v. Woeber*, 174 A.3d 1096, 1104 (Pa. Super.

2017) (concluding that evidence of the complainant's prior inconsistent statement, suggesting others had assaulted her on night in question—not the defendant—was relevant and potentially admissible). However, "a witness may not be contradicted upon a collateral matter" that "has no relationship to the matter on trial." *Johnson*, 638 A.2d at 942-43; *see also Holder*, 815 A.2d at 1119-20 (concluding that prior rape allegation against third party was immaterial to whether defendant assaulted the victim and was a collateral matter, unsuitable for cross-examination).

Following our review of the record, the briefs of the parties, the applicable law, and the trial court Opinion, we discern no abuse of the trial court's discretion in excluding the prior statements made by the Victim. The Honorable Christylee L. Peck has authored a comprehensive and well-reasoned Opinion, citing the record and relevant case law. *See* Trial Ct. Op. at 15-17 (concluding that the Victim's allegation against her brother was irrelevant to whether Appellant abused the Victim and that it did not tend to prove some motive of the Victim to fabricate an allegation against Appellant), 17-19 (concluding that allegation against her stepmother was irrelevant because there was no causal relationship between alleged physical abuse by the stepmother and the sexual abuse by Appellant).

Because Appellant may not challenge the Victim on a collateral matter, the statements proffered were irrelevant and inadmissible. *See Johnson*, 638 A.2d at 942-43. Thus, we discern no abuse of the trial court's discretion in denying their admission. *Allison*, 703 A.2d at 18.

For these reasons, we affirm on the basis of the trial court's Opinion filed November 19, 2019. The parties are instructed to attach a copy of Opinion to all future filings.

Judgment of Sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/27/2020

COMMONWEALTH

v.

STEVEN DEVON
GREENFIELD

: IN THE COURT OF COMMON PLEAS OF
: CUMBERLAND COUNTY, PENNSYLVANIA
:
:
:
: CP-21-CR-3097-2017
:

OPINION PURSUANT TO PA. R.A.P. 1925

Peck, J., November _19_, 2019 –

FINDINGS OF FACT & PROCEDURAL HISTORY

On July 13, 2018, a jury found Appellant guilty of the following: Count 2, Criminal Attempt to Statutory Sexual Assault, a felony of the first degree; Count 3, Involuntary Deviate Sexual Intercourse (IDSI) with a Child, a felony of the first degree; Count 4, IDSI, a felony of the first degree; Count 6, Incest, a felony of the second degree; Count 7, Endangering the Welfare of Children, a felony of the third degree; Count 8, Indecent Assault of a Child, a felony of the third degree; Count 9, Indecent Assault, a misdemeanor of the second degree; and Count 10, Corruption of a Minor, a felony of the third degree.[1] Appellant was sentenced to a total period of incarceration of 8.5 to 17 years.[2] Appellant's offenses resulted from Appellant's sexual conduct with his daughter ("the Victim"), and occurred over the course of several years in Cumberland County, Pennsylvania. The Commonwealth's evidence to support the charges was as follows:

The Victim was 17 years old at the time of trial; Appellant, her father, was 50 years old. The Victim testified that the earliest sexual incident she could recall with Appellant occurred when she was 12 years old, when she got "in trouble" and

---

[1] Verdict Slips, dated July 13, 2018; Order of Court, In re: Verdict/Bail/Appear for Sentence, July 13, 2018 (Peck, J.). The Commonwealth withdrew two counts during the course of the trial before the jury was charged. Order of Court, In re: Count 1 and Count 5 Withdrawn, July 12, 2018 (Peck, J.); Transcript of Proceedings, In re: Jury Trial, Day Four, July 12, 2018, at 3 (Peck, J.) (hereinafter "N.T. Day 4 at ___").

[2] Order of Court, In re: Sentence, October 11, 2018 (Peck, J.).

Appellant asked her to come into his bedroom.[3] Appellant told the Victim if she "wanted to stay in his house, [she] had to suck his thing."[4] Appellant positioned the Victim's head and mouth to do so, which she did "for a little while" before stopping because she "didn't want to anymore."[5] Thereafter, Appellant directed the Victim to come to his bedroom from time to time, where he would tell her to take off her clothes and proceed to attempt to penetrate the Victim's vagina with his penis.[6] The Victim explained that "it wouldn't work," because she would squeeze her legs together or say "ow" when she felt physical pain, though occasionally Appellant continued and told her she would "just have to take the pain."[7] The Victim said that Appellant would also kiss her, play with her breasts, and put his mouth on her vagina.[8] The Victim explained that her step-mother was never home when Appellant attempted sexual acts with the Victim.[9] Because the Victim's siblings were usually home, Appellant would put a bin in front of the door and ask the Victim to "look for something" in the bin to avoid looking suspicious.[10]

The Victim said most of Appellant's conduct occurred in his bedroom in their home, but identified other locations: in the Victim's bedroom she shared with her sisters, in the living room, in a hotel room, at TJ Rockwell's where Appellant and all the children worked in the mornings before school, and in Appellant's car in a parking lot.[11] Appellant sometimes took the Victim to TJ Rockwell's at night after closing, where he took her in the restroom and attempted to have sexual

---

[3] Transcript of Proceedings, In re: Jury Trial, Day Two, July 10, 2018, at 37-38 (Peck, J.) (hereinafter "N.T. Day 2 at ___").

[4] Id. at 38.

[5] Id. at 39.

[6] Id. at 40.

[7] Id. at 41.

[8] Id. at 42. When asked what Appellant would do when his mouth was on her vagina, the Victim said, "he would lick it, I don't know, or try to stick his tongue inside me." Id.

[9] Id. at 46-47.

[10] Id. at 54.

[11] Id. at 43-46.

2

intercourse with her or make her engage in oral sex with Appellant.[12] The Victim indicated that semen came out of his penis "most of the time."[13] Sometimes Appellant had the Victim stay home from school so they could engage in sex acts in the living room.[14] When the Victim was about 15 or 16 years old, Appellant took her to a hotel where he attempted sexual intercourse with her and engaged in oral sex with her.[15] Appellant also sent photos of his penis to the Victim and asked her to delete the same thereafter.[16] The Victim also detailed an occasion when Appellant drove her to a parking lot at night where no one would see them.[17]

Intertwined with Appellant's conduct with the Victim was Appellant's sexual relationship with Victim's friend, Erikia Ricker, who moved into the home in January of 2017.[18] At first, the Victim said, the Victim's role in Appellant and Erikia's relationship consisted of the Victim watching Appellant and Erikia have sexual intercourse so the Victim could serve as the "lookout" and ensure no one entered the room.[19] Thereafter, Appellant prompted Erikia and the Victim to engage in oral sex with each other.[20] Appellant either watched or kissed them while the same occurred.[21] On one evening, the Victim and Erikia were sleeping on the floor of the girls' bedroom when Appellant walked in and the Victim felt someone's hands in her pants.[22] The Victim's two younger sisters were asleep in

---

[12] Id. at 43-44.

[13] Id. at 44.

[14] Id. at 45-46.

[15] Id. at 51-52. A manager at the Motel 6 in Carlisle testified for the Commonwealth, and presented hotel records showing Appellant's check-in and check-out dates. Id. at 155-56; Commonwealth's Exhibit No. 7.

[16] N.T. Day 2 at 53.

[17] Id. at 63.

[18] Id. at 189.

[19] Id. at 59-60.

[20] Id. at 60-61. The Victim explained that Appellant wanted the Victim to put her mouth on Erikia's vagina, and Erikia would do the same to the Victim when Appellant asked her to. Id.

[21] Id. at 61.

[22] Id. at 65.

their beds in the room while Appellant was sitting on the bed prompting Erikia to touch the Victim and perform oral sex on the Victim.[23]

Cumberland County Children and Youth Services (CCCYS) and the Upper Allen Township Police became involved after a friend of Erikia's heard Erikia and the Victim talking about the Victim's sexual relationship with Appellant and reported the same to CCCYS.[24] CCCYS and Detective Sergeant Barnes went to Appellant's home on March 23, 2017 to speak with Appellant and Erikia.[25] The Victim did not know why they were at the home until Erikia texted the Victim and told her that her friend reported what she heard.[26] The Victim read text messages at trial from Erikia, wherein Erikia told the Victim, "Don't say a mother fucking thing to that lady. She's there about you. Deny anything happening between anybody, understand?"[27] Erikia also texted, "Remember when we were talking to [my friend]? Yeah well she reported it. So you need to deny everything and anything that happened," "[My friend] reported your dad trying to touch you," "Just make sure you deny anything between him and I and anything between you and I," and "Delete any evidence of anything out of your phone now."[28] During the friend's testimony, she read text messages from Erikia, wherein Erikia texted, "if [the Victim] gets pissed off at me she will mess around with her dad[']s turn on spots just to try to split us up because she knows how much he means to me."[29]

Erikia's testimony largely corroborated the Victim's testimony. Erikia said she officially moved into the home in January of 2017 when she was 18 years

---

[23] Id. at 66-67.

[24] Id. at 74-75. Erikia's friend testified for the Commonwealth that she called CCCYS about what she heard. The friend said that the Victim said she was in the room to be the lookout and was sometimes asked to join in. Id. at 165-72.

[25] Id. at 75.

[26] Id. at 76.

[27] Id. at 78; Commonwealth's Exhibit No. 4.

[28] N.T. Day 2 at 78-80; Commonwealth's Exhibit No. 4.

[29] N.T. Day 2 at 181; Defense Exhibit No. 10.

old.[30] At that time, she and Appellant were in a sexual relationship and Appellant would ask the Victim to either sit in the room while Appellant and Erikia had sex or sit outside the room to ensure no one intruded.[31] Eventually, Erikia said, Appellant began getting "touchy feely" with the Victim and asked her to join in on their sexual activities.[32] Erikia said Appellant "would start trying to have [the Victim] give him oral sex[,] [a]nd eventually once he kept pushing it he would just kind of like straddle her face and pretty much force her to give him oral sex where she couldn't really get away from him."[33] Erikia detailed other occasions where Appellant would attempt intercourse, touch the Victim's breasts, "put his hands down her pants," and "put his fingers inside of her vagina . . . because he wanted to take her virginity," which he "blatantly admitted" to both the Victim and Erikia.[34] Erikia testified that the Victim would cover her face, squeeze her legs together, and tell Appellant "that no, she doesn't want this to happen," but the Victim "didn't want to hurt his feelings either."[35] Just as the Victim testified, Erikia testified that Appellant would ask Erikia and the Victim to engage in sexual touching while he watched and joined.[36] Erikia pointed to one occasion in March of 2017 when Erikia had pneumonia and the Victim and Appellant performed oral sex on each other in the living room while Erikia was on the couch.[37]

---

[30] N.T. Day 2 at 182.
[31] Id. at 192-93.
[32] Id. at 193-94.
[33] Id.
[34] Id. at 194. Erikia detailed Appellant's actions, including that he "would kind of straddle her and take the top of his penis against her vagina," and use his fingers to do the same. Id. See also id. at 196-98.
[35] Id. at 195.
[36] Id. at 198.
[37] Transcript of Proceedings, In re: Jury Trial, Day Three, July 11, 2018, at 9 (Peck, J.) (hereinafter "N.T. Day 3 at ___").

Erikia said that when CCCYS came to the home on March 23, 2017, Appellant's wife picked up Erikia and Appellant at work to take them home.[38] In the car, Appellant asked Erikia to text the Victim and tell her not to say anything to anyone "because [Appellant] doesn't want to get arrested."[39] Erikia also confirmed the text messages she sent to the Victim telling the Victim to delete everything from her phone and say nothing.[40] Detective Sergeant Barnes interviewed Appellant and Erikia at the police station the day he and CCCYS appeared at the home.[41] Detective Sergeant Barnes said that Appellant initially denied having a sexual relationship with either the Victim or Erikia, but ultimately admitted to a sexual relationship with the Erikia when Detective Sergeant Barnes informed Appellant that Erikia had already confirmed the same.[42] At this time, Appellant was not permitted in the home unsupervised.[43]

The Victim was twice interviewed at the Children's Resource Center (CRC). At the first interview, the Victim denied any sexual contact with Appellant.[44] The Victim explained,

> I didn't want it to be my fault that dad would spend all that – all those years in prison, like because he was telling me how he could die in there. Also, I was very scared. I didn't want him to be mad at me. I didn't want him to hate me.[45]

Thereafter, the Victim got in contact with her biological mother on Facebook and told her, generally, that Appellant had been having sexual contact with her.[46] When

---

[38] N.T. Day 2 at 205-06.
[39] Id. at 207.
[40] Id. at 208-10.
[41] N.T. Day 3 at 53.
[42] Id. at 70.
[43] N.T. Day 2 at 81.
[44] Id. at 83.
[45] Id.
[46] Id. at 84.

Appellant saw these messages, he yelled at the Victim and broke her phone.[47] The Victim then told her mother that nothing happened and what she meant was that Appellant was hitting her rather than sexually assaulting her.[48] The Victim explained that she defended Appellant and expressed anger at CCCYS involvement because Appellant "kept yelling" at her and blaming her.[49]

On July 26, 2017, the Victim was interviewed at CRC a second time after telling a coworker that Appellant gave her a hickey on her neck while wrestling with her.[50] The coworker testified for the Commonwealth to the same effect, stating that she called Childline after the Victim told her Appellant caused the hickey.[51] At this second interview, the Victim disclosed Appellant's sexual relationship with her.[52] The Victim explained that prior to the interview, she was at a CCCYS placement hearing and Appellant was "pacing up and down the hallway" and telling the Victim, "this is all your fault."[53] When the Victim met with her guardian *ad litem* before the hearing, she was visibly stressed from the same, which led to Victim telling her "what happened" and that Appellant was putting too much stress on her.[54]

The defense presented seven witnesses: Appellant, Appellant's wife, four of Appellant's children, and Appellant's niece. Appellant's children and niece testified that they never saw or heard anything unusual, at home or at TJ

---

[47] Id. at 84-85.

[48] Id. at 84-85; Commonwealth's Exhibit No. 5.

[49] N.T. Day 2 at 88.

[50] Id. at 90. Dr. Lori Frasier, an expert witness for the Commonwealth, testified about her examination of the Victim on July 26, 2017, explaining that the examination showed no medical abnormalities because the Victim was examined outside the brief window of time that would show sexual contact or trauma. N.T. Day 3 at 41-45.

[51] N.T. Day 2 at 149-50.

[52] Id. at 91-92.

[53] Id. at 92.

[54] Id. We note that the Victim identified this person as her "guardian angel" for the CCCYS placement hearing, which we presume to mean her guardian *ad litem*. See id.

Rockwell's or elsewhere, to indicate that Appellant and the Victim had an improper relationship, and that the home was small and the walls were thin.[55] Appellant's wife, Shelly Yocum, said that neither she nor Appellant knew what was happening on March 23, 2017 when CCCYS and police came to the home to speak to Appellant and Erikia.[56] Shelly denied that Appellant asked Erikia to relay any messages to the Victim, including any directive to delete evidence.[57] Shelly said that she was not aware of Appellant's affair with Erikia until the police started questioning Shelly, and at the time of trial Shelly believed Appellant had an affair only with Erikia and not with the Victim, "[b]ecause there was opportunity there for him and Erikia, not for him and [the Victim]."[58]

When Appellant took the stand, he denied any improper relationship with the Victim.[59] Appellant explained that bringing the Victim into his bedroom and shutting his bedroom door to keep the other children out "could never happen" because his "kids are all over the place."[60] Appellant said that he had never heard any allegation of any sexual contact with the Victim at TJ Rockwell's, that he sent photos of his penis to the Victim, or that he had taken the Victim anywhere in a car prior to trial when the Victim testified about the same.[61] Appellant said that during his interview with Detective Sergeant Barnes, he thought he was being questioned in relation to his relationship with Erikia, but denied the same because he "already knew that they couldn't do nothing to me."[62] When asked on cross-examination why Appellant told one of the detectives, "I know darn well Erikia and [the

---

[55] See generally N.T. Day 4 at 5-63.
[56] N.T. Day 3 at 162-64.
[57] Id. at 166.
[58] Id. at 171.
[59] N.T. Day 4 at 87, 94.
[60] Id. at 99. Appellant also said he never had any sexual relations with Erikia in the home, and only at a hotel. Id. at 95.
[61] Id. at 97.
[62] Id. at 81-82, 85.

8

Victim] didn't have any contact," Appellant said he was mistaken and someone from law enforcement had already told him before the interview that the questioning was about the Victim.[63] Appellant denied directing Erikia to tell the Victim to hide evidence when CCCYS and police appeared.[64]

Based on the foregoing evidence, on July 13, 2018, the jury returned a verdict of guilty on all counts.[65] On October 11, 2018, following receipt of a presentence investigation report, this Court sentenced Appellant to a total period of incarceration of 8.5 to 17 years, in addition to costs, fines, SORNA registration requirements, and a prohibition from contact with the Victim.[66] On October 12, 2018, Appellant filed a timely motion for post-sentence relief, challenging the weight of the evidence and moving for a new trial on the basis of suppression of statements the Victim made during the investigation.[67] The Commonwealth filed a Response on November 26, 2018,[68] and this Court denied Appellant's motion on November 29, 2018.[69] No direct appeal was filed. On February 21, 2019, trial counsel moved to withdraw and to appoint alternate counsel to pursue appellate or post-conviction relief.[70] This Court held a hearing on the motion on March 19, 2019 to ascertain what occurred with respect to the direct appeal and thereafter permitted trial counsel to withdraw.[71] Allen Welch, Esquire was appointed to file a

---

[63] Id. at 106.

[64] Id. at 79.

[65] Verdict Slips, dated July 13, 2018; Order of Court, In re: Verdict/Bail/Appear for Sentence, July 13, 2018 (Peck, J.).

[66] Order of Court, In re: Sentence, October 11, 2018 (Peck, J.).

[67] Defendant's Motion for Post-Sentence Relief, October 12, 2018.

[68] Commonwealth's Response to Defendant's Post-Sentence Motion, November 26, 2018.

[69] Order of Court, In re: Defendant's Motion for Post-Sentence Relief, November 29, 2018 (Peck, J.).

[70] Motion to Withdraw as Counsel and For Appointment of Alternate Counsel, February 21, 2019.

[71] Order of Court, In re: Motion to Withdraw Counsel/Appoint Public Defender (March 19, 2019) (Peck, J.).

PCRA action to pursue reinstatement of direct appeal rights,[72] which he did on May 14, 2019, unopposed by the Commonwealth.[73] This Court granted the petition and reinstated Appellant's direct appeal rights *nunc pro tunc* on July 15, 2019.[74] Appellant subsequently filed a timely Notice of Appeal on August 14, 2019 and a Concise Statement of Errors Complained of on Appeal on September 16, 2019, complaining as follows:

> 1. Whether the Trial Court erred in denying Petitioner relief in the form setting aside the guilty verdicts of Criminal Attempt – Statutory Sexual Assault, Invol. Deviate Sexual Intercourse W/Child, Endangering Welfare of Children, Indecent Assault Person Less than 14 Years of Age, and Corruption Of Minors, as the verdict was against the weight of the evidence where testimony of witnesses contradicted each other and as such was incredible.
> 2. Whether the Trial Court erred in denying Petitioner's request to introduce statements of the victim made during the investigation, which statements would have been refuted at trial by defense witnesses if given the opportunity.[75]

We offer this Opinion, pursuant to Pa.R.A.P. 1925(a), in support of our judgment.

---

[72] See Order of Court, In re: Motion to Withdraw Counsel/Appoint Public Defender, March 19, 2019 (Peck, J.); Order of Court, In re: Appointment of Counsel, March 20, 2019, (Guido, P.J.).
[73] Post Conviction Relief Act Petition, May 14, 2019; Commonwealth's Answer to Defendant's Post Conviction Relief Act Petition, June 25, 2019.
[74] Order of Court, In re: Defendant's Post Conviction Relief Act Petition, July 15, 2019 (Peck, J.).
[75] Notice of Appeal, August 14, 2019; Concise Statement of Errors Complained of on Appeal, September 16, 2019.

## DISCUSSION

### a. Weight of the Evidence

Appellant first argues that this Court erred in failing to set aside five of the jury's guilty verdicts.[76] When reviewing weight of the evidence claims, the standard of review is as follows:

> A challenge to the weight of the evidence is directed to the discretion of the trial judge, who heard the same evidence and who possesses only narrow authority to upset a jury verdict. The trial judge may not grant relief based merely on some conflict in testimony or because the judge would reach a different conclusion on the same facts. Relief on a weight of the evidence claim is reserved for extraordinary circumstances, when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.

Commonwealth v. Sanchez, 36 A.3d 24, 39 (Pa. 2011) (internal citations omitted). As the Supreme Court of Pennsylvania has noted, "the jury . . . may choose to believe all, part, or none of the evidence." Id. An appellant may prevail on a challenge to the weight of the evidence only where the evidence is "so tenuous, vague and uncertain that the verdict shocks the conscience of the court." Commonwealth v. Miller, 172 A.3d 632, 643 (Pa. Super. 2017), *appeal denied*, 183 A.3d 970 (Pa. 2018) (quoting Commonwealth v. Talbert, 129 A.3d 536, 546 (Pa. Super. 2015), *appeal denied*, 138 A.3d 4 (Pa. 2016)).

We summarize the offenses for which Appellant challenges the weight of the evidence: (1) Criminal Attempt to Statutory Sexual Assault, satisfied where a person has intent to engage in sexual intercourse with a complainant under 16 years old and this person is 11 or more years older than the complainant, and not married to the complainant, and "does any act which constitutes a substantial step"

---

[76] See Concise Statement of Errors Complained of on Appeal, September 16, 2019.

11

toward the same, 18 Pa.C.S. § 901(a), § 3122.1(b); (2) IDSI with a Child, satisfied where "the person engages in deviate sexual intercourse with a complainant who is less than 13 years of age," 18 Pa.C.S. § 3123(b); (3) Endangering Welfare of Children, satisfied where "[a] parent, guardian or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person . . . knowingly endangers the welfare of the child by violating a duty of care, protection or support," 18 Pa.C.S. § 4304(a)(1); (4) Indecent Assault of a Child, satisfied where "the person has indecent contact with the complainant, causes the complainant to have indecent contact with the person or intentionally causes the complainant to come into contact with seminal fluid, urine or feces for the purpose of arousing sexual desire in the person or the complainant and      the complainant is less than 13 years of age," 18 Pa.C.S. § 3126(a)(7); and (5) Corruption of Minors, satisfied where a person 18 years old or older "corrupts or tends to corrupt the morals of any minor less than 18 years of age, or . . . aids, abets, entices or encourages any such minor in the commission of an offense under Chapter 31," 18 Pa.C.S. § 6391(a)(1)(ii). We note that "a true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed." Miller, 172 A.3d at 643 (quoting Commonwealth v. Thompson, 106 A.3d 742, 748 (Pa. Super. 2014)).

We find guidance as to what Appellant believes may support a weight of the evidence argument in Appellant's post-trial motion, where Appellant argued that the Victim and Erikia were the only eyewitnesses to Appellant's crimes and that their testimony contradicted one another in some respects.[77] Appellant also argued

---

[77] Appellant averred that Erikia denied, contrary to the Victim's testimony, that Appellant once came into the girls' bedroom and prompted Erikia to put her hands in the Victim's pants; the Victim denied, contrary to Erikia's testimony, that Appellant abused the Victim in the living room while Erikia was on the couch with pneumonia; the two witnesses did not agree on the number of times they went to a hotel with Appellant; and the witnesses agreed the room they

that some of Appellant's testimony came to light for the first time at trial rather than during the investigation, and that the other children and Appellant's wife testified that the relationship was "not possible."[78] We note that at trial, on cross-examination of the Victim, the defense evidently sought to undermine the weight of the Commonwealth's evidence via exposing the Victim's inability to, for example, identify her exact age during particular sexual episodes, or name the precise dates she went to a hotel with Appellant.

The jury, however, ultimately weighed the evidence in favor of the Commonwealth, which far from shocks the conscience of this Court. We do not find the evidence contrary to the verdicts, and note that the jury is free to believe all, part, or none of the evidence. Resolving contradictory testimony and questions of fact are within the province of the jury. See Commonwealth v. Miller, 172 A.3d 632, 642 (Pa. Super. 2017), *appeal denied*, 183 A.3d 970 (Pa. 2018); Commonwealth v. Blakeney, 946 A.2d 645, 652 (Pa. 2008). The Commonwealth presented the Victim's testimony, in which the Victim told the jury that when she was about 12 years old, and Appellant was about 45 years old,[79] Appellant called the Victim into his bedroom and prompted her to perform oral sex on him. The Victim told the jury that the abuse continued through the years, and she detailed moments when Appellant attempted to force sexual intercourse on the Victim as she squeezed her legs together and protested in pain. The Victim told the jury that Appellant kissed her, touched her breasts, and forced oral sex with her. The Victim told the jury that when Appellant began a sexual relationship with Erikia, the Victim was asked to stand and watch as Appellant and Erikia had sex and was

---

stayed in on a particular date had one bed but Detective Sergeant Barnes and the hotel manager identified that room as having two beds. Defendant's Motion for Post-Sentence Relief, October 12, 2018.

[78] Defendant's Motion for Post-Sentence Relief, October 12, 2018.

[79] Appellant was born March 21, 1968. N.T. Day 3 at 53.

ultimately asked to join, which included the Victim and Erikia performing oral sex on each other at Appellant's urging. The Commonwealth offered Erikia's testimony, which largely corroborated the Victim's testimony. Erikia testified that the Victim did watch her have sex with Appellant, prompt the Victim to join them, attempt sexual intercourse with the Victim, force oral sex on the Victim, and prompt the girls to touch each other.

The fact that the Victim stated she did not have sexual contact with Appellant the day that Erikia had pneumonia, or the fact that the Victim could not remember the dates she went to a hotel or identify how many beds were in a particular hotel room, or the fact that Erikia testified Appellant never came into the girls' bedroom and direct Erikia to sexually touch the Victim (though she testified it occurred in other locations), or certainly that the only witnesses to Appellant's abuse of his minor daughter were his minor daughter and his extra-marital girlfriend does not tip the scales so grossly against guilty verdicts to shock this Court's conscience. Further, reliance on Appellant's and his witnesses' testimony that such a relationship was not possible is unpersuasive. This Court cannot substitute its judgment for that of the jury, which evidently credited the Commonwealth's evidence more heavily than it did Appellant's. It was not within this Court's power to take a different view of the evidence than the jury based on some conflict in testimony. Commonwealth v. Blakeney, 946 A.2d 645, 653 (Pa. 2008).

In Commonwealth v. Jenkins, 578 A.2d 960 (Pa. Super. 1990), the defendant challenged his convictions for sexual offenses against his children based on the weight of the evidence. The Superior Court acknowledged that the children's testimony was at times contradictory and inconsistent regarding dates and times of the abuse and the respective participants, that the children "both admitted that they do not always tell the truth," and that one child "admitted that on various occasions she has named others as sexual abusers, and she admitted that if she were mad at

14

someone she would name them as a sexual abuser." Jenkins, 578 A.2d at 963. The court determined, however, that "[t]he jury was free to accept all, some or none of the testimony," and the jury evidently chose to believe the victims which did not shock the court's sense of justice. Id. This conclusion was not disturbed by the fact that the defendant denied committing the acts charged and that a physician could find no evidence of abuse. Id. In Appellant's case, as in Jenkins, the jury was free to credit any or all of the Commonwealth's evidence and little to none of Appellant's evidence. We discern no conflict or uncertainty in evidence so great that the jury's verdicts should have been disturbed.

b. Victim's Statements

Appellant next and finally complains that this Court erred in denying Appellant's "request to introduce statements of the victim made during the investigation, which statements would have been refuted at trial by defense witnesses if given the opportunity."[80] Appellant raised the same issue in his post-sentence motion, identifying the statements as those the Victim made alleging that her brother and stepmother perpetrated acts of abuse on her.[81]

We begin with the Victim's statements that her brother ("J.G.") sexually abused her. Before the Commonwealth called the Victim to testify, the Commonwealth moved to preclude any questioning of the Victim "about any allegations that her brother, [J.G.], touched her," which the Commonwealth said occurred "a couple years" before the trial.[82] Defense counsel responded that he planned to use the allegation against J.G. purely to attack the Victim's credibility by later calling J.G. as a witness to deny the allegation.[83] The parties agreed that the alleged touching did not have any relation to Appellant's conduct with the Victim, other than the

---

[80] Concise Statement of Errors Complained of on Appeal, September 16, 2019.
[81] Defendant's Motion for Post-Sentence Relief, October 12, 2018.
[82] N.T. Day 2 at 3-4.
[83] Id. at 3.

fact that the Victim disclosed both events during the same CRC interview.[84] This Court ruled the testimony inadmissible pursuant to Pennsylvania "Rape Shield Law," which we interpreted to include past allegations of sexual assault, and further on the basis of irrelevance to Appellant's conduct, but advised counsel we could revisit the point when he called J.G. to testify.[85] Counsel did not attempt to revisit the point during J.G.'s testimony.

We acknowledge the Rape Shield Statute, 18 Pa.C.S. § 3104, was amended in 2019 to specifically bar evidence of a victim's past sexual victimization and that the same was not delineated in the statute applicable at the time of trial. Nevertheless, case law interpretation of the statute and traditional evidence rules support the exclusion of such evidence.[86] In Commonwealth v. Coia, 492 A.2d 1159 (Pa. Super. 1985), the defendant sought to admit an affidavit of the victim's friend stating that the victim had made a series of "repeated and unbelievable claims of sexual attacks upon herself by others" to discredit the victim's claim that the defendant actually assaulted her. Coia, 492 A.2d at 1161. The court ruled the evidence inadmissible for failing to exculpate the appellant, lacking relevance to the defendant's alibi defense, and risking "unnecessarily prejudic[ing] the victim by permitting unproven allegations of prior sexual activity with third parties to be presented before a jury." Id. See also Commonwealth v. Johnson, 638 A.2d 940, 942 (Pa. 1994) ("a witness may not be contradicted upon a collateral matter").

The same concerns were present in Appellant's case. At sidebar, we sought to find a closer link to Appellant's conduct that might bring the allegation into greater

---

[84] Id. at 5. At the CRC interview, according to defense counsel, the Victim alleged that "her brother touched and tried to suck her boobs through her clothing." Id. at 5.

[85] Id. at 5-7.

[86] "If the prior sexual conduct was a prior sexual assault, then the Rape Shield Law does not apply and the evidence is evaluated under the general evidentiary rules." Commonwealth v. Fink, 891 A.2d 1235, 1242 (Pa. Super. 2002). See also Commonwealth v. Schley, 136 A.3d 511, 515-18 (Pa. Super. 2016); Commonwealth v. Woeber, 174 A.3d 1096, 1103 (Pa. Super. 2017).

relevance and materiality, but found none with the agreement of trial counsel, outside the fact that the disclosure was made contemporaneously with the Victim's disclosure of Appellant's conduct. The Commonwealth at sidebar argued that the CRC interviewers ask open-ended questions, including "did anyone touch you, did anyone else touch you[,]" which prompted disclosures involving three of the Victim's family members.[87]

We are cognizant that credibility of the Victim is of course at issue, but note that neither Appellant's trial counsel nor this Court could surmise any connection between abuse by J.G. and Appellant's conduct to the extent the allegation would make it less likely or untrue that Appellant sexually abused the Victim. We note that the statement was not offered, nor would it show, some motive of the Victim to fabricate an allegation and falsely accuse the Appellant, nor would the statement have implicated another assailant in Appellant's place. See, e.g., Commonwealth v. Woeber, 174 A.3d 1096 (Pa. Super. 2017); Commonwealth v. Wall, 606 A.2d 449 (Pa. Super. 1992). Further, with respect to confusion of the issues, the allegation would have presented an entirely separate and new event for the jury to determine its veracity. Had trial counsel cross-examined the Victim about the allegation against J.G. and then later presented J.G. to testify that he never assaulted the Victim, the jury would have been tasked with deciding two separate cases of sexual abuse.

We turn now to the Victim's statements during the investigation about Shelly, her step-mother. At sidebar, Appellant's trial counsel explained that during the Victim's second CRC interview, the Victim "alleged pretty harsh physical abuse at the hands of Shelly," including that "Shelly abused her, hit her, broke her phone, threw a shoe at her," and "[h]it her so hard that she had a black eye, saw blue

---

[87] See N.T. Day 3 at 4.

flashes, things like that."[88] Trial counsel explained that this line of questioning "goes directly to her credibility," because "[t]he other children in the house that were living there are prepared to say this never happened."[89] Trial counsel sought to cross-examine the Victim about those statements and then produce Shelly and their children to testify that no abuse ever occurred.[90]

Appellant's counsel did not aver that any physical abuse by Shelly had any relation to any sexual abuse by Appellant, other than the fact that the Victim revealed both at the same interview, and agreed that there was no suggestion of a causal relationship between Shelly's abuse and Appellant's abuse or the Victim's decision to disclose.[91] This Court sustained the Commonwealth's objection on the basis that the statement related to a separate incident and was not relevant to Appellant or Appellant's conduct.[92] We advised counsel that we could revisit the point if counsel could lay a foundation through questioning that Shelly's abuse was relevant to Appellant particularly.[93] When questioning resumed, defense counsel attempted to connect Shelly's abuse to Appellant by asking the Victim if anyone other than Appellant caused her to decide against disclosing at her first interview, but the Victim said "no" and counsel abandoned the point.[94]

Any testimony concerning the Victim's alleged statement at the CRC interview that Shelly abused her was not relevant to whether Appellant sexually abused the Victim. We understand that trial counsel sought to attack the Victim's credibility, and the Victim's credibility is relevant, but an allegation that Shelly was physically abusive was, as trial counsel agreed, not related or in any way connected to

---

[88] N.T. Day 2 at 125.
[89] Id.
[90] Id. at 125, 127.
[91] Id. at 126-128.
[92] Id. at 127-28.
[93] Id. at 128-29.
[94] Id. at 129.

18

Appellant or his conduct and therefore collateral. We determined that any evidence regarding alleged physical abuse by Shelly would confuse the jury and that same would not exculpate Appellant of his charged conduct.

## CONCLUSION

Based on the foregoing reasons, this Court finds that the weight of the evidence supported the jury's guilty verdicts, and that this Court did not err in excluding testimony surrounding the Victim's allegations against others during the investigation. We respectfully request that the Pennsylvania Superior Court affirm.

BY THE COURT,

_____
Christylee L. Peck,    J.


Allen Welch, Esq.
3300 Trindle Road
Camp Hill, PA 17011
Counsel for Appellant

Cumberland County District Attorney's Office


NOV 22 2019
Copies mailed on _____

NOV 22 2019
Copies delivered on _____